In the Matter of FEDERATED DEPARTMENT STORES, INC., et al., Debtors.

UNITED STATES of America, Appellant,

v.

FEDERATED DEPARTMENT STORES, INC., et al., Appellees.

No. C–1–93–175.
Bankruptcy No. 1–90–130.

United States District Court,
S.D. Ohio,
Eastern Division.

July 28, 1994.

Gerald C. Miller, U.S. Dept. of Justice, Tax Div., Washington, DC, Louis Hill, Cincinnati, OH, for appellant.

Jeffrey Alan Lipps, Jones, Day, Reavis & Pogue, Columbus, OH, John M. Newman, Jr., Jones Day Reavis & Pogue, Cleveland, OH, for appellees.

### OPINION AND ORDER

GEORGE C. SMITH, District Judge.

The Internal Revenue Service ("IRS") appeals the bankruptcy court's decision allowing Federated Department Stores and Allied Stores Corporation currently to deduct break-up fees associated with a failed merger defense to a hostile takeover, pursuant to 26 U.S.C. § 162 and 26 U.S.C. § 165. This Court has jurisdiction under 28 U.S.C. § 158(a).

### I.

The facts of this case are undisputed. While the legal dispute between the IRS and Federated and between the IRS and Allied is the same, each dispute involves slightly dif-

ferent facts. A summary of the facts of each transaction follows.

### A. The Allied/DeBartolo/Campeau Transaction

In 1986, Allied Stores Corporation ("Allied"), one of the largest department store chains in the country, was performing well and none of its five stores were for sale. In August of 1986, the Campeau Corporation offered to purchase Allied's five stores for $300 million, a bid that Allied dismissed as too low.

On September 4, 1986, Campeau sent an unsolicited proposal to acquire 55% of Allied for $58 per share. On September 11, after consulting with financial advisors Goldman, Sachs & Co., Allied rejected Campeau's offer. Allied decided against discussing any type of merger with Campeau because of the massive debt Campeau would incur to finance the acquisition, because of the disruption that would occur in Allied's business as a result of the transaction, and because of concerns about Campeau's inexperience in the retailing industry.

On September 12, Campeau launched an unsolicited hostile tender offer for Allied. The offer was two-tiered: Campeau would pay $58 in cash for 55% of Allied's shares and a combination of securities, and cash for the remainder of the shares. This offer was set to expire on October 9.

On September 23, Allied met with Goldman, Sachs to discuss Campeau's most recent offer. At this meeting Allied decided: 1) that Campeau's $58 offer was too low and that it should recommend that its shareholders not tender their shares; and 2) if Allied was to avoid a hostile takeover, it would have to engage in some type of defensive measures such as recapitalization plans, asset sales, of defensive measures such as recapitalization plans, asset sales, corporate acqui-

sitions, leveraged buy-outs, "crown jewel" sales, and "white knight" mergers.

On September 29, Campeau amended its two-tiered offer. The first tier of the offer would pay $68 in cash for the 80% of Allied's outstanding shares, and the second tier would receive a combination of cash and securities. The new offer was set to expire on October 10.

In response to the new offer, Allied began negotiating a possible "white knight" transaction with the Edward DeBartolo Corporation. On October 3, Allied and DeBartolo reached an agreement whereby DeBartolo would pay $67 per share for all outstanding shares. Allied agreed to escrow funds sufficient to pay DeBartolo "break-up" fees of $1 per share and all out-of-pocket expenses, should the merger fall through.[1]

On October 8, after considering both the DeBartolo merger proposal and the amended Campeau offer, the Allied board approved the DeBartolo proposal and recommended that its shareholders tender their shares to DeBartolo. On October 9, Allied placed $105 million in escrow to cover any possible break-up fees.

On October 24, Campeau terminated its tender offer and bought approximately 48% of Allied shares from the arbitrage firm Jefferies & Company. This acquisition, in conjunction with the 4% already owned by Campeau, gave Campeau direct control of a majority of Allied's shares. Campeau's control rendered the DeBartolo transaction virtually impossible.

On October 20 and 31, Campeau offered to buy the remaining 48% of Allied's shares for $69 per share, an offer which Allied's board eventually recommended to its shareholders.

In accordance with the DeBartolo merger proposal, Allied paid DeBartolo $116,298,236 in break-up fees. Allied deducted this pay-

---

1. The bankruptcy court found that break-up fees are an ordinary and customary provision in white knight transactions. In addition to making the target corporation less suitable to a hostile suitor, the fees "reimburse the white knight for monies spent to arrange financing, retain counsel and investment banking assistance, pay commitment fees and cover other substantial costs and expenses incurred in responding quickly in a hostile takeover situation." *In re Federated Dep't Stores, Inc.*, 135 B.R. 950, 954 (Bankr.S.D.1992).

In contrast, the government contends that these fees are "nothing more than liquidated damages." *Beebe v. Pacific Realty Trust*, 578 F.Supp. 1128, 1150 n. 7 (D.Or.1984).

ment in full on its 1986 corporate income tax return.

### B. Federated/Macy/Campeau Transaction

In 1988, Federated, the largest department store chain in the United States, was performing well, had adopted various defensive measures to avoid hostile takeover bids, and was not for sale. In January of 1988, however, Federated learned of rumors that it might become the target of a hostile takeover by Campeau. Campeau was known in the retail industry for its takeover and subsequent dismantling of Allied.

The takeover rumors were accurate, and on January 25, 1988, Campeau launched a hostile tender offer for all of Federated's shares at $47 per share. The offer, set to expire on February 22, was contingent on Campeau obtaining the necessary financing. On January 28, Federated's board of directors met to assess the Campeau offer and to explore any defensive measures available to repel the takeover. The board, after consulting with investment bankers, reconvened on February 4. At the meeting, Federated's board decided that the Campeau offer should be rejected because the price offered was too low and the financing was too speculative. In addition, the board feared that if Campeau acquired Federated, it would dismantle it in the same manner that it did with Allied. Accordingly, Federated recommended that its shareholders reject the tender offer.

Throughout February, Federated tried various defensive maneuvers. Finally, on February 29, R.H. Macy & Company ("Macy") offered to buy approximately 80% of Federated's shares for $73.80 in cash with the remainder of the shares to be exchanged for stock in the new merged entity. Macy's offer, like that of DeBartolo, included a break-up fee provision. Macy's initial proposal was modified somewhat with the final offer entailing a price of $74.50 per share for 80% of Federated's shares with the remaining 20% receiving shares in the new entity. The break-up provision stated that if Federated was acquired by someone other than Macy, Federated would pay all of Macy's expenses, up to $45 million, plus 25% of any excess consideration received by Federated's

shareholders from the new acquiror. The offer was set to expire on April 4.

On March 1, the Federated board recommended that Federated's shareholders accept the Macy offer and reject the Campeau offer because Macy had greater retail experience and its financing was more secure.

On March 7, Campeau amended its offer to $75 per share for 80% of the shares and $44 for any remaining shares. Macy, in response to Campeau's amended offer, increased its proposal to include an additional $200 million in cash for the front-end shares in exchange for the option to purchase two of Federated's leading stores, Bullock's and I. Magnin. On March 15, Macy further amended its offer to $77.35 cash per share.

On March 31, without the knowledge or involvement of Federated, Campeau and Macy met privately and negotiated an agreement whereby Macy would withdraw its tender offer if Campeau would ensure that Federated would pay Macy the $60 million in break-up fees.

On April 1, Federated was informed that the Macy offer was no longer open and that the only offer still available was Campeau's for $73.50 cash per share for all shares. Left with only one option, the Federated board recommended that its shareholders accept the Campeau offer.

Federated honored its break-up fee agreement and paid Macy $60 million, deducted in full on Federated's 1988 corporate income tax return.

Shortly after being acquired by Campeau, both Allied and Federated filed for bankruptcy. In the bankruptcy court, the Debtors (Allied and Federated) advanced two theories as to why the break-up fees were currently deductible: 1) that the break-up fees were deductible under 26 U.S.C. § 162 as ordinary and necessary business expenses, and 2) that the break-up fees were deductible under 26 U.S.C. § 165(a) as costs incurred in an abandoned transaction.

The Debtors argued their cases as if they bore the burden of proof as to deductibility under both § 162 and § 165(a). The bankruptcy court, which had assigned the burden

of proof to the IRS, held that the IRS failed to establish that the fees were not deductible under § 162 or § 165(a). In addition, the bankruptcy court held that the Debtors had, in any event, sufficiently met the burden of proof in demonstrating the validity of their deduction under § 162 or § 165. Accordingly, the bankruptcy court allowed the Debtors currently to deduct the break-up fees.

The IRS appeals, alleging that the bankruptcy court decision must be reversed because the break-up fees were not currently deductible under either § 162 or § 165.

## II.

### A. Standard of Review

■ Bankr.R. 8013 provides in part that "findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard must be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." Under this standard, a bankruptcy court's findings will not be overturned as long as the judge's inferences are reasonable and supported by the evidence. *In re Southern Indus. Banking Corp.*, 809 F.2d 329, 331 (6th Cir.1987).

■ If a bankruptcy court's account of the evidence is plausible in light of the record viewed in its entirety, a district court may not reverse it even though convinced that had it been sitting as a trier of fact, it would have weighed the evidence differently. *See Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985).

■ A bankruptcy court's conclusions of law, however, are reviewed *de novo*. *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 389 (6th Cir.1986).

### B. Burden of Proof

The IRS argues that the bankruptcy court erroneously assigned it the burden of proof. This Court, however, does not need to reach this issue to decide this case. Even though the bankruptcy court assigned the burden of proof to the IRS, the Debtors in the bankruptcy proceeding tried the case as if they bore the burden of proof. At the end of the trial, the bankruptcy court made alternate findings of fact on the burden of proof issue and found for the Debtors in both cases. First, the bankruptcy court held that the IRS had failed to carry its burden of proving that the tax assessed was correct. Second, the bankruptcy court held that the Debtors, who had tried the case as if they had the burden, "overwhelmingly" proved that the tax deficiencies assessed were improper. Therefore, regardless of the assignment of the burden of proof, the Debtors still met that burden.

The courts are split as to whether the IRS or the taxpayer bears the burden of proof for tax claims in a bankruptcy proceeding. *Compare Placid Oil v. IRS*, 988 F.2d 554 (5th Cir.1993) (placing the burden on the IRS) with *IRS v. Levy*, 973 F.2d 265 (4th Cir.1992) (burden remains with taxpayer); *Resyn Corp. v. United States*, 851 F.2d 660 (3rd Cir.1988) (burden remains with taxpayer). While the determination of which party bears the burden of proof in a bankruptcy proceeding has no effect on this case, the Court acknowledges that this question has yet to be answered in the Sixth Circuit.

### C. Deductibility Under 26 U.S.C. 162

■ Section 162 of the Internal Revenue Code allows the deduction of all "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." 26 U.S.C. Section 162(a). *See Comm'r v. Lincoln Sav. & Loan Ass'n*, 403 U.S. 345, 352, 91 S.Ct. 1893, 1898, 29 L.Ed.2d 519 (1971) (establishing the general rule that in order for an expense to be deductible it must (1) be paid or incurred during the taxable year, (2) be for carrying on any trade or business, (3) be an expense, (4) be a necessary expense, and (5) be an ordinary expense). An expense is ordinary even if it rarely occurs or only occurs once within the lifetime of the taxpayer. *Welch v. Helvering*, 290 U.S. 111, 114, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933). Although the transaction may be unique to the individual taxpayer, the question is whether the transaction is ordinary in the "life of the group, the community, of which [the taxpayer] is a part." *Id.* An expense is necessary if it meets "the minimal

requirement that the expense be 'appropriate or helpful' for the development of the [taxpayer's] business." *Comm'r v. Tellier*, 383 U.S. 687, 689, 86 S.Ct. 1118, 1119–20, 16 L.Ed.2d 185 (1966) (quoting *Welch v. Helvering*, 290 U.S. at 113, 54 S.Ct. at 8–9.

In contrast to an ordinary and necessary expense deductible under § 162, a capital expenditure is any "amount paid out for new building or for permanent improvements or betterment made to increase the value of any property or estate." 26 U.S.C. § 263. A capital expenditure may not be deducted but must be capitalized. *Id.* According to the United States Supreme Court,

[t]he primary effect of characterizing a payment as either a business expense or a capital expenditure concerns the timing of the taxpayer's cost recovery: while business expenses are currently deductible, a capital expenditure usually is amortized and depreciated over the life of the relevant asset. . . .

*INDOPCO, Inc. v. Comm'r*, —— U.S. ——, ——, 112 S.Ct. 1039, 1042, 117 L.Ed.2d 226 (1992). Whether an item is currently deductible or whether it must be capitalized is the source of this dispute between the IRS and the Debtors.

The bankruptcy court determined that white knight transactions and the break-up fees associated with such transactions are ordinary and necessary methods of defense to hostile takeover bids. *Federated*, 135 B.R. at 961. Neither party contests this finding on appeal. The controversy in this case, however, revolves around two issues. First, whether the recent Supreme Court case of *INDOPCO v. Comm'r*, —— U.S. ——, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992), requires reversal of the bankruptcy court's decision. Second, whether the break-up fees were used to defend an existing business against attack or to change the corporate structure for the benefit of future operations.

The bankruptcy court rendered its decision less than seven weeks before the United States Supreme Court issued its decision in *INDOPCO*. On appeal, the IRS asserts that *INDOPCO* requires the bankruptcy court's decision to be overturned and the break-up fees capitalized rather than currently deducted. The Court, however, does not believe that *INDOPCO* compels such a result.

Whether an item is deductible depends on the facts of each case. *Id.* at ——, 112 S.Ct. at 1045. In *INDOPCO*, the Supreme Court considered the issue whether the taxpayer, then known as National Starch, could deduct $2.7 million in investment banking and legal fees incurred by a target company in the course of a friendly, not hostile, merger. The target corporation, National Starch, was an industrial chemical manufacturer and a supplier of Unilever. Unilever was the friendly acquiring company. In order to facilitate a tax-free takeover, the companies engaged in a reverse subsidiary cash merger.[2]

To ensure that the Unilever acquisition was fair, and to uphold their fiduciary duties, the directors of National Starch employed investment bankers and attorneys to analyze the transactions. The fees for these services were in excess of $2.7 million. National Starch claimed a current deduction for the investment banking fees, nearly $2.2 million, on its 1978 income tax return. In addition, National Starch alleged that it had the right to deduct the additional $500,000 in legal fees. The IRS disagreed with National Starch contending that the fees cannot be deducted because National Starch realized a future benefit from the expenditure of the fees.

---

2. In *INDOPCO*, a publicly held corporation was acquired and became a wholly owned subsidiary of the acquiror. The Court referred to this transaction as a "reverse subsidiary cash merger." *INDOPCO*, —— U.S. at ——, 112 S.Ct. at 1041.

The tax court in *National Starch & Chem. Corp. v. Comm'r*, 93 T.C. 67, 74, 1989 WL 80679 (1989), *aff'd*, 918 F.2d 426 (3rd. Cir.1990), *aff'd*, *INDOPCO v. Comm'r*, —— U.S. ——, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992), held that this type of merger is not an inherent capital transaction. If this type of merger were inherently capital, as the IRS contends, the benefit analysis would not have to be conducted. As in *INDOPCO*, however, the Court finds that "reverse mergers" are not inherently capital. The Court must therefore determine whether the expenditure in question provided any long term benefit to Allied or Federated.

The Tax Court, and later the Third Circuit Court of Appeals, agreed with the IRS finding that "both Unilever's enormous resources and the possibility of synergy arising from the transaction served the long-term betterment of National Starch." *National Starch,* 918 F.2d 426, 432–33 (3rd. Cir.1990); *see INDOPCO,* —— U.S. at ——, 112 S.Ct. at 1045.

■ The Supreme Court granted certiorari to determine whether a separate and distinct capital asset is necessary before an item can be capitalized or whether receiving future benefit is sufficient to require capitalization. The Supreme Court held that either a future benefit or the creation of a separate and distinct capital asset may compel capitalization. *INDOPCO,* —— U.S. at —— – ——, 112 S.Ct. at 1044–45. An expenditure that does not create a separate and distinct asset, but rather provides the taxpayer a benefit that extends beyond the year in which the expenditure occurred, may be capitalized. *Id.* The *INDOPCO* Court cautioned, however, that the "mere presence of an incidental future benefit—'*some* future aspect'—may not warrant capitalization...." *Id.*

■ For post-*INDOPCO* tax decisions, the courts are left with a standard that requires capitalization in two situations: 1) when a separate and distinct asset is created; or 2) when the taxpayer realizes benefits that are more than incidental in years after the expenditure was made.

In *INDOPCO,* a separate and distinct capital asset was not created and therefore capitalization could only be required if the Court found that National Starch received a more than incidental long-term benefit from the transaction. Relying on the record from both the Tax Court and the Third Circuit Court of Appeals, the Supreme Court found that National Starch received significant benefits that extended beyond the tax year in question. *Id.* at ——, 112 S.Ct. at 1045.

Just as the Supreme Court in *INDOPCO* relied on the lower courts' findings of fact as to whether the takeover provided National Starch with long-term benefits, this Court relies on the bankruptcy court's findings that no benefit accrued beyond the year in which the expenditure was made.

■ Whether the transaction creates a long term benefit is a question of fact. *National Starch,* 918 F.2d at 432. In reviewing the bankruptcy court's findings of fact, this Court should not overturn those findings unless they are clearly erroneous. *Id.;* Bankr.R. 8013. Recently, the Court of Appeals for the Sixth Circuit stated, to be clearly erroneous "a decision must strike us as more than just maybe or probably wrong; it must ... strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *United States v. Perry,* 908 F.2d 56, 58 (6th Cir.), *cert. denied,* 498 U.S. 1002, 111 S.Ct. 565, 112 L.Ed.2d 571 (1990) (quoting *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc.,* 866 F.2d 228, 233 (7th Cir.1988), *cert. denied,* 493 U.S. 847, 110 S.Ct. 141, 107 L.Ed.2d 100 (1989)). The bankruptcy court's decision that no future benefit was created does not strike the Court with the force of a five-week-old, unrefrigerated dead fish.

The Court finds that the subject hostile takeovers could not, and did not provide Federated or Allied with the type of synergy found in *INDOPCO.* In *INDOPCO,* National Starch was the supplier of Unilever. The Tax Court and the Third Circuit Court of Appeals found that the synergy created by National Starch's newly acquired access to Unilever's resources and distribution network would provide significant long-term benefits. *INDOPCO,* —— U.S. at ——, 112 S.Ct. at 1045.

■ Such synergy was not created in the takeover of Allied and Federated by Campeau. Both Allied and Federated were large department store chains. *Federated,* 135 B.R. at 953, 955. Campeau was inexperienced in the retailing field. *Id.* at 953. The Court concludes that no synergy resulted from the merger of two companies with wholly unrelated business operations, and that the bankruptcy court's findings are supported by the record.

The IRS argues that the break-up fees were intended to change the corporate structure for the benefit of future operations. The Debtor's response to this contention was

that the break-up fees were not to restructure the corporation, but rather were part of the defensive measures invoked by the Debtor's to repel the hostile takeover attempts. The bankruptcy court held that the break-up fees were an attempt to defend the business against attack, not to restructure the corporation. *Id.* at 961.

The bankruptcy court's decision is supported by the evidence. Campeau launched hostile tender offers for both Allied and Federated. In an attempt to avoid the hostile takeovers, both Allied and Federated engaged in defensive measures—the white knight proposals with DeBartolo and Macy respectively. The break-up fees would be paid to the white knight in the event that transaction fell through to compensate it for expenses incurred.

This Court agrees with the bankruptcy court's conclusion that the costs incurred to defend a business against attack are ordinary and necessary expenses. *See NCNB Corp. v. United States,* 684 F.2d 285 (4th Cir.1982); *Locke Mfg. Cos. v. United States,* 237 F.Supp. 80 (D.Conn.1964) (permitting a corporation to deduct expenses incurred in a successful defense to proxy fight); *Central Foundry Co. v. Comm'r,* 49 T.C. 234, 1967 WL 1282 (1967) (allowing deduction of proxy fees incurred in an unsuccessful defense). The underlying reasoning in this line of cases is that the expenses were incurred to protect corporate policy and structure, not to acquire a new asset. *NCNB Corp.* 684 F.2d at 290. These cases were, of course, decided before *INDOPCO.*

*INDOPCO,* however, does not undermine the earlier decisions. It merely adds another criteria that courts should examine in ascertaining the tax classification of an expenditure—whether an expenditure creates a future benefit. *INDOPCO* does not stand for the principal that any expenditure that merely preserves the existing corporate structure or policy must be capitalized. The Court considers the expenses incurred in defending against a proxy fight as expenditures that protect the existing policies or structure of a business. Such expenditures are currently deductible and do not require capitalization.

■ The Court agrees with the IRS that expenditures incurred to change a corporation's structure must be capitalized. *See General Bancshares Corp. v. Comm'r,* 326 F.2d 712, 715 (8th Cir.), *cert. denied,* 379 U.S. 832, 85 S.Ct. 62, 13 L.Ed.2d 40 (1964). The facts of this case, however, simply do not support the IRS's contention that the break-up fees were incurred to restructure the corporation in hopes of some future benefit. The bankruptcy court specifically found that the "[d]ebtors engaged in protracted and strenuous defensive tactics when faced, involuntarily, with the threat of Campeau's hostile acquisition." *Federated,* 135 B.R. at 961. While the benefit of hindsight should not be used to determine the classification of an expenditure, it is useful to assess the validity of the Debtor's apprehension. After acquisition by Campeau, both Allied and Federated ended up in bankruptcy. This supports that the expenditures of Allied and Federated should be characterized as defensive actions and not intended to restructure the company for some long term benefit. For the above reasons, the Court finds that the bankruptcy court did not err in determining that the break-up fees were currently deductible under § 162 as ordinary and necessary business expenses.

### D. Deductibility under Section 165

■ Section 165 of the Internal Revenue Code allows current deduction of any "loss sustained during the taxable year and not compensated by insurance or otherwise." 26 U.S.C. § 165(a).

Both of the proposed white knight transactions imposed contractual obligations on Allied and Federated to pay break-up fees to DeBartolo and Macy, respectively, if the mergers were terminated. There is no dispute that the white knight mergers were terminated and that Allied and Federated were contractually obligated to pay the break-up fees. In both cases the break-up fees represent costs incurred in abandoned transactions. They were not compensated by insurance or otherwise, and therefore they are currently deductible under § 165.

The dispute between the IRS and the Debtors centers around whether the break-

up fees are associated with an abandoned capital transaction. The Debtors contend, and the bankruptcy court found, that there were two separate and distinct transactions. One transaction involved merging with Campeau and the other involved merging with the white knight. The IRS, on the other hand, contends that in each case there was only one transaction: a successful merger with Campeau. This Court believes that the better reasoned position is that of the bankruptcy court. Simply stated, there were two separate transactions: the failed mergers with the respective white knights, and the successful mergers with Campeau.

■ Section 165 allows a current deduction for costs associated with an abandoned capital transaction. *Sibley, Lindsay & Curr Co. v. Comm'r*, 15 T.C. 106, 1950 WL 33 (1950); *Doernbecher Mfg. Co. v. Comm'r*, 30 B.T.A. 973, 1934 WL 335 (1932), *aff'd*, 80 F.2d 573 (9th Cir.1935). The crucial question is whether the subject transaction was actually abandoned.

The cases cited by the bankruptcy court, and relied on by the Debtors on appeal, support the proposition that the break-up fees were associated with abandoned capital transactions.

In *Sibley*, the taxpayer sought to revise its capital structure and employed Goldman, Sachs & Co. to submit possible restructuring plans. Goldman, Sachs submitted three mutually exclusive proposals. Sibley adopted one of the proposals and sought to deduct as a loss the fees associated with the other two proposed plans. The IRS opposed the deductions contending that the fees were all part of one restructuring plan. The Tax Court disagreed, finding that the three proposals were "separate and distinct suggestions," only one of which the taxpayer could undertake. *Sibley*, 15 T.C. at 110. The other two proposals were considered abandoned and the fees associated with these proposals were allowed current deduction under § 165. *Id.*

■ The reasoning applied by the Tax Court in *Sibley* applies to the facts this case. In this case, both Allied and Federated were presented with two mutually exclusive capital transactions: a merger with the white knight or a merger with Campeau. A merger with Campeau necessarily would result in the abandonment of the merger with the white knight. Just as the fees of the proposed restructuring in *Sibley* were deductible, the break-up fees in this case should be currently deductible.

Each transaction must be viewed separately. Just because a failed capital transaction has some effect on a later successful capital transaction does not prevent a deduction for a loss sustained in the failed transaction. *Portland Furniture Mfg. Co. v. Comm'r*, 30 B.T.A. 878, 881, 1934 WL 321 (1934). In *Portland Furniture*, the taxpayer and other furniture manufacturers planned to merge in 1929. In preparing for the merger the taxpayer incurred expenses for appraisers, accountants, attorneys, and engineers. After incurring these expenses, the taxpayer abandoned the merger. In 1930, the taxpayer engaged in new merger negotiations with several other companies. The 1930 merger was eventually completed, based to some extent on the information gathered for the 1929 merger. The IRS contested the taxpayer's deduction of the 1929 merger costs because the information had provided some benefit for the 1930 merger. The Tax Court rejected the IRS's position and allowed a current deduction under § 165 because the original merger had been abandoned. The court in *Portland Furniture* found:

> The evidence establishes that the 1929 merger proposal was definitely abandoned in that year. If nothing more were shown petitioner would unquestionably be entitled to the deduction claimed.... We fail to see why the deduction should be denied because of the petitioner's subsequent participation in a different combination from that proposed in 1929. True, it appears that some of the reports prepared in 1929 were used as a starting point in the 1930 negotiations, but that does not change the fact that the project in connection with which the reports were prepared was abandoned in 1929 and in that year the petitioner had suffered a loss of the amount paid.

*Id.* at 881.

Similarly, in the instant case, the white knight mergers were abandoned. Any effect

that this merger had on the later merger with Campeau is irrelevant.

The IRS contends that the break-up fees were paid to get out of one transaction in order to engage in a more favorable transaction. As such, the fees should be considered a capital expenditure of the completed merger and not a loss from the abandonment of the failed merger.

The cases cited by the IRS in support of its theory are distinguishable. All three cases that the IRS cites as support dealt with payments made by the taxpayers to extricate themselves from an existing contract or lease in order to enter into a more beneficial arrangement. *Darlington–Hartsville Coca–Cola Bottling Co. v. United States*, 273 F.Supp. 229 (D.S.C.1967), *aff'd*, 393 F.2d 494, 496 (4th Cir.1968), *cert. denied*, 393 U.S. 962, 89 S.Ct. 402, 21 L.Ed.2d 376 (1968); *Peerless Weighing & Vending Machine Corp. v. Comm'r*, 52 T.C. 850, 1969 WL 1627 (1969); and *Rodeway Inns of Am. v. Comm'r.*, 63 T.C. 414, 1974 WL 2730 (1974).

In the cases cited by the IRS, the taxpayer voluntarily expended funds as part of an overall plan ultimately to secure a more favorable contract or lease. In the instant case, the bankruptcy court did not find the Debtors' actions to be voluntary. The record supports that finding. In the Allied transaction, Campeau acquired 52% of Allied's stock and effectively prevented Allied from merging with DeBartolo. In the Federated transaction, Campeau and Macy met privately and negotiated the withdrawal of the Macy bid without knowledge or consent of the Federated board. The mergers with Campeau and the necessary abandonment of the mergers with the white knights were far from voluntary. In fact, the bankruptcy court found "that both Debtors fought tooth and nail to prevent the consummation of the mergers with Campeau." *Federated*, 135 B.R. at 959. In neither case did the Debtors voluntarily terminate the white knight mergers in order to engage in a more favorable merger with Campeau.

The cases cited by the IRS indicate that expenses paid before fulfilling a capital transaction must be capitalized as part of that transaction. The cases cited by the Debtors illustrate that amounts expended after a failed capital transaction may be deducted currently as a loss, even if the failed transaction is of some use in a later transaction. The facts of this case are more similar to those of the cases cited by the Debtors.

The IRS further contends that there was only one transaction because the break-up fees were paid in order to jack up the prices of the Allied and Federated shares. The break-up fees would thus be an integral element of the mergers with Campeau. The bankruptcy court, however, found no facts to support this theory. *Federated*, 135 B.R. at 960 (neither Allied nor Federated paid the fees to facilitate a better deal with Campeau).

The IRS claims that the Allied and Federated board of directors' sole duty was to "sell the company at the highest price attainable for the stockholders' benefit." *Revlon, Inc. v. MacAndrews & Forbes Holdings*, 506 A.2d 173, 184 n. 16 (Del.1986). Based on this duty, any and all measures taken to increase the ultimate bid must be capitalized.

The facts of this case are not analogous to the facts in *Revlon*. In *Revlon*, it was apparent that "the break-up of the company was inevitable." *Id.* When it is inevitable that the company is going to break-up, the duty of the board of directors shifts from preservation of the company as a corporate entity to "the maximization of the company's value at a sale for the shareholder's benefit." *Id.* at 181. In this case, however, the facts do not support the proposition that the break-up of Federated or Allied was inevitable. To the contrary, the bankruptcy court specifically found that the boards for both Allied and Federated believed that merger with the white knights would prevent break-up of the companies. *Federated*, 135 B.R. at 954, 956. Absent the threat of inevitable break-up, the boards exercised their "fiduciary duty not only to their shareholders, but also to their broader-based 'stakeholders.'" *Id.* at 960. This means that the boards were not acting to maximize the companies' value but to preserve the companies.

Both Allied and Federated incurred break-up fee expenses as a result of the abandoned white knight merger transactions. The ex-

penses were not covered by insurance or otherwise. Consequently, the expenses are deductible under 26 U.S.C. § 165.

### III.

The break-up fees paid by both Allied and Federated are deductible either under 26 U.S.C. § 162, as ordinary and necessary business expenses, or under 26 U.S.C. § 165, as losses not compensated by insurance. Therefore, the Court **AFFIRMS** the bankruptcy court's judgment.

**IT IS SO ORDERED.**