**A.E. STALEY MANUFACTURING COMPANY AND SUBSIDIARIES,** Petitioner–Appellant,

v.

**COMMISSIONER OF INTERNAL REVENUE,** Respondent–Appellee.

No. 96–1940.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 23, 1996.

Decided July 2, 1997.

Dan Burt, Henry B. Miller (argued), Burt, Maner & Miller, Washington, DC, for Petitioner–Appellant.

Stuart L. Brown, Internal Revenue Service, Washington, DC, Gary R. Allen, Jonathan S. Cohen, Steven W. Parks (argued), Department of Justice, Tax Division, Appellate Section, Washington, DC, for Respondent–Appellee.

Before HARLINGTON WOOD, JR., RIPPLE and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.

The predecessor of A.E. Staley Manufacturing Company and Subsidiaries ("Staley") paid investment bankers in connection with an unsuccessful effort to defeat a hostile tender offer. On its federal income tax return, the company claimed a deduction for the fees paid to the bankers. The Commissioner of Internal Revenue disallowed the claimed deduction and issued a notice of deficiency. Staley's predecessor then filed a petition in the United States Tax Court challenging the disallowance. The Tax Court agreed with the Commissioner and held that the expenses were capital expenditures which cannot be deducted. Staley now appeals the Tax Court's judgment, and we reverse and remand for further proceedings consistent with this opinion.

# I

## BACKGROUND

### A. *Facts*

Staley, the petitioner in this case, was an affiliated group of corporations, formerly named Staley Continental, Inc. and Subsidiaries ("SCI"). The predecessor of both petitioner and SCI was A.E. Staley Manufacturing Co. ("AES"). From its organization in 1906 until November 1984, AES' primary business consisted of storing, marketing, milling, processing and refining corn and soybeans. AES employed a process called corn wet milling to produce sweeteners, starches, oils and other ingredients for the food and beverage industry. AES' principal product was high fructose corn syrup. By the mid–1980s, high fructose corn syrup had become

the leading sweetener in the country's food and beverage market, especially in the soft drink industry.

Because AES believed that the market had matured for its product, in 1984 its board of directors made the long-term strategic decision to enter into the food service business. AES diversified into this area by acquiring other companies, including CFS Continental, Inc., one of the country's leading suppliers in the food service industry. SCI was formed and became the parent company of AES and CFS Continental, Inc. Using the revenues it earned from corn wet milling, SCI began to pursue growth in the food service business.

When an investment banker threatened to acquire SCI in 1986, SCI began to fear the possibility of a hostile takeover. SCI hired a law firm in response, which advised SCI to adopt antitakeover devices. SCI followed this advice and adopted some antitakeover measures. SCI also hired the First Boston Corporation and Merrill Lynch Capital Markets (collectively, "investment bankers") to prepare SCI for, and to advise and assist SCI in the event that another company were to attempt, a hostile takeover. SCI also agreed to hire the investment bankers to represent SCI in the event an offer was made.

In March 1987 Merrill Lynch made presentations to SCI's management and board of directors, in which it recommended that SCI take certain actions to prepare for any unsolicited takeover attempts. SCI implemented many of these proposals and, at the suggestion of Merrill Lynch, set up a defense team of attorneys, investment bankers and SCI executives.

Because Merrill Lynch also suggested that SCI identify friendly "white knight" investors to acquire enough stock in SCI to block any future takeover attempt, SCI sought out Tate & Lyle and discussed the possibility of Tate & Lyle's acquiring a 20% interest in SCI. Some casual conversation occurred about the possibility of merging the two companies. Tate & Lyle began purchasing SCI stock on the open market in April 1987; it soon acquired about 4% of the company. SCI soon feared Tate & Lyle, though, because Tate & Lyle would not sign a "stand-still agreement," which would limit the amount of stock that Tate & Lyle would purchase. When Tate & Lyle filed a Hart-Scott–Rodino notification to acquire up to 25% of SCI's stock, SCI feared that this action would put SCI up for sale and decided to resist additional purchases of its stock.

On April 8, 1988, Tate & Lyle made a public tender offer directly to SCI's stockholders to purchase shares for $32 per share. On that same day, Tate & Lyle also sued SCI to enjoin the use of SCI's antitakeover devices and the application of various states' antitakeover statutes. Tate & Lyle's chairman of the board of directors and chief executive officer, Neil M. Shaw, wrote Donald E. Nordlund, who held the same positions at SCI, stating that if Tate & Lyle were successful in its bid to acquire SCI, it would cancel SCI's diversification policy by selling CFS Continental, Inc. and would return SCI back to its core business, corn syrup. The management, board of directors and investment bankers of SCI considered Tate & Lyle's tender offer to be hostile because it was made without their consent or knowledge. On April 9 the defense team of SCI held an emergency meeting at which it decided that the tender offer was not in the best interests of the company or its shareholders because Tate & Lyle had no capital, marketing or research and development to offer. However, because the board recognized that it had a duty to evaluate the merits of the tender offer, it hired First Boston and Merrill Lynch on April 12 to advise and assist it with respect to the offer. The agreements provided that the investment bankers' fees for their services would be (1) $500,000 in cash; (2) an additional fee of 0.40% of the value of the transaction if Tate & Lyle or another company acquired at least 50% of SCI's stock; (3) an additional fee of 0.40% of the recapitalization if SCI effected a recapitalization; and (4) additional quarterly fees of $500,000 for four quarters if no fees were paid under (2) or (3). SCI and the investment bankers then began to consider alternatives to the tender offer, including a recapitalization, a leveraged buy-out and a sale to a white knight.

On April 18 the investment bankers indicated to SCI that their evaluation had revealed that $32 per share was below the true value of SCI's stock. They also discussed the different alternatives to the tender offer that were available to SCI: the sale of SCI in its entirety, the sale of a division, a recapitalization, a leveraged buy-out, a placement of blocks of stock, a spin-off, a public offering and the commencement of an offer to acquire Tate & Lyle ("pac-man" defense). On April 20 SCI's board voted unanimously to reject Tate & Lyle's tender offer. The investment bankers then discussed with other corporations the possibilities of a friendly purchase of SCI and of a loan for a recapitalization. To assist in this regard, the investment bankers prepared a selling book for prospective buyers that contained information about SCI.

On April 29 Tate & Lyle raised its offering price to $35 per share. On May 2 SCI's board determined that the offer was still inadequate and should be rejected. Again the board resolved, and the investment bankers continued, to investigate alternatives. Once again SCI urged its shareholders to reject the tender offer. On May 10 the investment bankers informed SCI that they had been unable to find an alternative to Tate & Lyle's offer that would persuade SCI's shareholders not to sell. In response, SCI's board instructed its attorneys to negotiate with Tate & Lyle while the investment bankers continued to look for alternatives. On May 13 Tate & Lyle increased its tender offer to $36.50 per share; the investment bankers informed SCI that this was a fair offer and that no alternatives had been found. SCI's board then determined that the price was fair and recommended that its stockholders should accept it. After the sale, Tate & Lyle replaced SCI's management, terminated 104 executives, closed the company's headquarters, fired the clerical staff and moved the executive offices. SCI's entire board of directors resigned. Tate & Lyle then sold CFS Continental, Inc. and changed SCI's name to A.E. Staley Manufacturing Company.

SCI paid $6,238,109 to First Boston and $6,272,593 to Merrill Lynch (and $165,318 to Charles P. Young for printing) for services in connection with SCI's response to Tate & Lyle's tender offers. It deducted these costs as business expenses on its tax return. The Commissioner disallowed all of the fees paid to First Boston and Merrill Lynch and $50,-000 of the printing costs.[1]

## B. *Tax Court Proceedings*

The full Tax Court held, with five judges dissenting, that neither the investment bankers' fees nor the printing costs were deductible. *See A.E. Staley Mfg. Co. v. Commissioner,* 105 T.C. 166, 1995 WL 535269 (1995). Judge Halpern, writing for the majority, relied upon the Supreme Court's recent decision, *INDOPCO, Inc. v. Commissioner,* 503 U.S. 79, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992), in which the Court held that costs incurred to facilitate a friendly acquisition are capital expenditures and are therefore not immediately deductible. The Tax Court began with the proposition that the taxpayer's subjective reasons for making an expenditure are irrelevant to the deductibility determination. Rather, under the "origin of the claim" test, *see Woodward v. Commissioner,* 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970), the nature of the transaction out of which the expenditures arose governs whether an item is a deductible expense or a capital expenditure. The Tax Court took the view that the transaction giving rise to the investment bankers' fees was an acquisition, a change in corporate structure. Because the Tate & Lyle acquisition was expected to and did affect SCI for the indefinite future, the court reasoned, the investment bankers' fees and printing costs, made in connection with that change in ownership, must be capitalized under *INDOPCO.* The court concluded that the hostile nature of the takeover did not distinguish the case from *INDOPCO* in any relevant sense.

The majority held further that the investment bankers' fees could not be deducted as costs associated with abandoned transactions under I.R.C. § 165. The court held that, to be allowed a deduction under § 165, the taxpayer must be able to allocate the fees to

---

1. The record does not reveal the reason that a portion of the printing costs was allowed.

separate and distinct proposals that were abandoned. In this case, the court noted, "[t]he bulk of the fees paid the investment bankers was pegged to a completed stock sale, not an abandoned recapitalization or other abandoned transaction." 105 T.C. at 200. The fee arrangement had provided for $1 million as a fixed fee, and the rest was payable because Tate & Lyle acquired at least 50% of SCI's common stock. Accordingly, the court ruled, § 165 was inapplicable.

Judge Beghe concurred and wrote separately to advance another theory for the nondeductibility of the fees. Under this alternate theory, the advice of the investment bankers benefited the shareholders of SCI by helping them obtain a higher price for their shares. In Judge Beghe's view, those fees allocable to benefiting the shareholders should not be deductible.

Judge Cohen, the trial judge in the case, dissented. She noted initially that the primary focus of *INDOPCO* was the rejection by the Supreme Court of the taxpayer's contention "that separate and distinct assets must be created or enhanced by the expenditures in order to be capitalized under section 263." 105 T.C. at 211 (Cohen, J., dissenting). In rejecting this contention, the Supreme Court "emphasized that the fees were capital expenditures because they were incurred for the purpose of facilitating a merger that created significant long-term benefits to [the taxpayer]." *Id.* at 212 (Cohen, J., dissenting). In contrast to the acquiring firm in *INDOPCO*, noted Judge Cohen, Tate & Lyle did not proceed in a friendly manner when it acquired SCI; SCI resisted the takeover and only reluctantly agreed to the merger after no alternative could be found. SCI's board perceived no benefits to the merger, and the only benefits cited by the majority, Judge Cohen asserted, are those Tate & Lyle perceived. Judge Cohen concluded that "the record as a whole indicates that the primary focus of the investment bankers' work was the pursuit of alternatives in an effort to prevent the Tate & Lyle tender offer from succeeding." *Id.* at 216 (Cohen, J., dissenting). Accordingly, the purpose of the expenditures was not to facilitate a change in corporate structure, but to prevent such a change. She further rejected Judge Beghe's analysis, questioning both whether the fees caused Tate & Lyle to increase its offering price and whether the benefits to shareholders are even relevant given the Supreme Court's omission of any such discussion in *INDOPCO*. Four other members of the court joined this dissenting opinion.

Judge Laro also dissented. In his view, the purpose of an expenditure is a relevant consideration under *INDOPCO*. He distinguished this case from *INDOPCO* on the basis that the present case involves a hostile takeover. Moreover, Judge Laro maintained, the majority had failed to identify any significant benefit to SCI as a result of the Tate & Lyle acquisition. He concluded that "[d]efensive measures are not intended to produce any lasting improvements; their goal is merely to preserve the status quo, to enable the target to continue its business operations in the same manner as before the threat emerged." *Id.* at 220 (Laro, J., dissenting). Because the majority disregarded SCI's purpose in incurring the costs and because, in his view, SCI's costs were incurred "to prevent, not facilitate, a change in corporate structure," Judge Laro would have allowed the deduction. *Id.*

## II

## DISCUSSION

■ Staley submits that the fees SCI paid the investment bankers are a deductible business expense under I.R.C. § 162(a). Staley, as the taxpayer, bears the burden of showing a right to the business deduction. *See INDOPCO*, 503 U.S. at 84, 112 S.Ct. at 1042–43. This burden is a real one because deductions are "a matter of legislative grace" and are "exceptions to the norm of capitalization." *Id.* They are, therefore, "strictly construed." *Id.*

■ Nevertheless, Staley's burden is not an insurmountable one. To qualify for deduction under § 162(a), "an item must (1) be 'paid or incurred during the taxable year,' (2) be for 'carrying on any trade or business,' (3) be an 'expense,' (4) be a 'necessary' expense, and (5) be an 'ordinary' expense." *Commissioner v. Lincoln Sav. & Loan Ass'n,*

403 U.S. 345, 352, 91 S.Ct. 1893, 1898, 29 L.Ed.2d 519 (1971) (quoting I.R.C. § 162(a)). There is no dispute that the fees paid by SCI satisfy *Lincoln Savings'* first, third and fourth factors. *See Commissioner v. Tellier,* 383 U.S. 687, 689, 86 S.Ct. 1118, 1119–20, 16 L.Ed.2d 185 (1966) (noting that the term "necessary" in this context "impos[es] only the minimal requirement that the expense be 'appropriate and helpful' for 'the development of the [taxpayer's] business'") (second set of brackets in original) (quoting *Welch v. Helvering,* 290 U.S. 111, 113, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933)). Nor is there any dispute that the fees were "ordinary" in the usual sense. An expense can be "ordinary" even if the taxpayer does not incur it on a recurring basis. *Welch,* 290 U.S. at 114, 54 S.Ct. at 9. Indeed, an expense may be an ordinary one even though it is incurred "once in a lifetime." *Id.* Rather, an expense is ordinary if it is a usual expense for the business community of which the taxpayer is a part. *Id.*

■ We do not understand the Commissioner's position to be that defending against takeover attempts is or was an unusual activity. Instead, the Commissioner submits that, under *INDOPCO, supra,* SCI's expenses should be classified as nondeductible capital expenditures. *See* I.R.C. § 263(a)(1) ("No deduction shall be allowed for ... [a]ny amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate."); *Tellier,* 383 U.S. at 689, 86 S.Ct. at 1119–20 ("The principal function of the term 'ordinary' in § 162(a) is to clarify the distinction, often difficult, between those expenses that are currently deductible and those that are in the nature of capital expenditures...."). The main difference between a business expense and a capital expense is the timing of the taxpayer's cost recovery. *INDOPCO,* 503 U.S. at 83, 112 S.Ct. at 1042. Whereas business expenses are currently deductible in full, "a capital expenditure usually is amortized and depreciated over the life of the relevant asset, or, where no specific asset or useful life can be ascertained, is deducted upon dissolution of the enterprise." *Id.* at 83–84, 112 S.Ct. at 1042. "Through provisions such as these, the Code endeavors to match expenses with the revenues of the taxable period to which they are properly attributable, thereby resulting in a more accurate calculation of net income for tax purposes." *Id.* at 84, 112 S.Ct. at 1043.

Distinguishing between expenses that can be deducted under § 162 and those that must be capitalized under § 263 is not an easy task. As the Supreme Court has noted, "the cases sometimes appear difficult to harmonize," and "each case 'turns on its special facts.'" *INDOPCO,* 503 U.S. at 86, 112 S.Ct. at 1044 (quoting *Deputy v. du Pont,* 308 U.S. 488, 496, 60 S.Ct. 363, 367, 84 L.Ed. 416 (1940)); *see also Welch,* 290 U.S. at 116, 54 S.Ct. at 9–10 ("To attempt to harmonize them would be a futile task."). Because of this difficulty, distinguishing between ordinary and capital costs often requires a rather pragmatic approach. In the oft-quoted words of Justice Cardozo:

> Here, indeed, as so often in other branches of the law, the decisive distinctions are those of degree and not of kind. One struggles in vain for any verbal formula that will supply a ready touchstone. The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle.

*Welch,* 290 U.S. at 114–15, 54 S.Ct. at 9.

We begin our pragmatic assessment with the well-worn notion that expenses incurred in defending a business and its policies from attack are necessary and ordinary—and deductible—business expenses. For example, in *Commissioner v. Heininger,* 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171 (1943), a dentist's mail order business faced ruin when the Postmaster General deprived him of access to the mails. The Supreme Court held that his legal fees, incurred in litigating the propriety of the Postmaster General's order, were properly deductible as ordinary and necessary business expenses:

> It is plain that respondent's legal expenses were both "ordinary and necessary" if those words be given their commonly accepted meaning. For respondent to employ a lawyer to defend his business from threatened destruction was "normal"; it was the response ordinarily to be expect-

ed.... [T]he expenses incurred in defending the business can also be assumed appropriate and helpful, and therefore "necessary."

*Id.* at 471, 64 S.Ct. at 252. The Court applied the same principle in *Commissioner v. Tellier*, 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966), to hold that the taxpayer's legal costs "incurred in his defense against charges of past criminal conduct" arising out of his business activities were deductible under § 162(a). *Id.* at 690, 86 S.Ct. at 1120 (also noting that "[t]he legal expenses deducted by the [taxpayer] were not capital expenditures"). And in *Welch* Justice Cardozo noted that attorney's fees paid by a company to "defen[d] against attack" are deductible, even though such an attack "may happen once in a lifetime." 290 U.S. at 114, 54 S.Ct. at 9.

Other courts within the federal judiciary have applied this principle in similar contexts. Most notably, in *Locke Manufacturing Companies v. United States*, 237 F.Supp. 80 (D.Conn.1964), the court held that proxy contest expenses, including legal fees, proxy solicitor's fees and public relations fees, incurred by a company that successfully resisted a stockholder's challenge were deductible. In that case, the taxpayer defended against a stockholder who opposed the taxpayer's corporate policy and attempted to unseat the company's board of directors. The court, citing *Welch*, reasoned that, because "[s]trug- gles for corporate control have been going on for many years—as long as the corporate form of organization has been recognized," it was ordinary for a company to spend money "to defend the policies of its directors from attack by those who would oppose them." *Id.* at 86–87. The IRS subsequently agreed to follow *Locke*, *see* Rev. Rul. 67–1, 1967–1 C.B. 28, and *Locke's* holding has since become established law. *See also Central Foundry Co. v. Commissioner*, 49 T.C. 234, 1967 WL 1282 (1967) (citing *Locke* and Revenue Ruling 67–1 and holding that proxy fight expenses incurred by prevailing stockholders/incoming managers and paid by company were deductible). Our court likewise has announced that "[e]xpenditures by a taxpayer to protect an established business are fully deductible as ordinary business expense." *Allen v. Commissioner*, 283 F.2d 785, 790–91 (7th Cir.1960).[2]

The foregoing line of authority was neither abrogated nor indeed even addressed by *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992). There the Supreme Court held that investment banker fees incurred during a friendly acquisition must be capitalized.[3] That holding was unremarkable; indeed, the Court was merely reaffirming settled law that costs incurred to facilitate a capital transaction are capital costs.[4] *See, e.g., Ellis Banking Corp. v. Commissioner*, 688 F.2d 1376 (11th Cir. 1982), *cert. denied*, 463 U.S. 1207, 103 S.Ct.

---

**2.** *Accord NCNB Corp. v. United States*, 684 F.2d 285, 290 (4th Cir.1982) (en banc) ("It is a long recognized principle of tax law that expenditures for the protection of an existing investment, the continuation of an existing business, or the preservation of existing income from loss or diminution are ordinary and necessary business expenses within the meaning of IRC § 162."); *Lutz v. Commissioner*, 282 F.2d 614 (5th Cir.1960) (holding that taxpayer's costs in paying another's debts were deductible because failure to pay would have jeopardized taxpayer's business license); *Fishing Tackle Products Co. v. Commissioner*, 27 T.C. 638, 644, 1957 WL 892 (1957) ("[I]t is well settled that expenditures made to protect and promote the taxpayer's business, and which do not result in the acquisition of a capital asset, are deductible.").

**3.** In *INDOPCO* the acquiring firm, Unilever, was interested in acquiring the taxpayer, National Starch, in a friendly transaction. Prior to the transaction, National Starch hired an investment banking firm, Morgan Stanley, to evaluate the offer and to assist in the event that a hostile tender offer emerged. Morgan Stanley found the offered price per share to be fair, and National Starch's board of directors approved the deal. After the transaction was consummated, National Starch claimed a deduction for the amounts paid to Morgan Stanley. The Supreme Court, affirming the Tax Court and the Third Circuit, held that the fees were not deductible and that they instead had to be capitalized. *See* 503 U.S. 79, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992), *aff'g, National Starch & Chem. Corp. v. Commissioner*, 918 F.2d 426 (3d Cir.1990), *aff'g*, 93 T.C. 67, 1989 WL 80679 (1989).

**4.** Prior to *INDOPCO*, some courts had deviated from this principle, requiring that an expenditure must have created or enhanced an asset to be capitalized. 503 U.S. at 83 & n. 3, 112 S.Ct. at 1042 n. 3.

35?.7, 77 L.Ed.2d 1388 (1983); *Mills Estate, Inc. v. Commissioner,* 206 F.2d 244 (2d Cir. 1953); *Fishing Tackle Products Co. v. Commissioner,* 27 T.C. 638, 645, 1957 WL 892 (1957). Justice Blackmun, quoting from a case that he had written as a Circuit Judge, reasoned that "expenses such as these, ' "incurred for the purpose of changing the corporate structure for the benefit of future operations are not ordinary and necessary business expenses." ' " *INDOPCO,* 503 U.S. at 89, 112 S.Ct. at 1045 (quoting *General Bancshares Corp. v. Commissioner,* 326 F.2d 712, 715 (8th Cir.) (quoting in turn *Farmers Union Corp. v. Commissioner,* 300 F.2d 197, 200 (9th Cir.), *cert. denied,* 371 U.S. 861, 83 S.Ct. 117, 9 L.Ed.2d 99 (1962)), *cert. denied,* 379 U.S. 832, 85 S.Ct. 62, 13 L.Ed.2d 40 (1964)); *see also id.* at 90, 112 S.Ct. at 1046 (noting that an expenditure is capital in nature if " 'the purpose for which the expenditure is made has to do with the corporation's operations and betterment . . . for the duration of its existence or for the indefinite future or for a time somewhat longer than the current taxable year' "). Because the goal of the Tax Code in this area is to match outlays with revenues, "a taxpayer's realization of benefits beyond the year in which the expenditure is incurred is undeniably important in determining whether the appropriate tax treatment is immediate deduction or capitalization." *Id.* at 87, 112 S.Ct. at 1044–45. Yet the Court did not purport to be creating a talismanic test that an expenditure must be capitalized if it creates some future benefit.[5] The taxpayer in *INDOPCO* spent money for its future betterment, and such an expendi-

ture, the Supreme Court held, is the epitome of a capital outlay. *INDOPCO* did not change the law with respect to costs incurred to defend a business. Such costs seek to preserve the status quo, not to produce future benefits, and are therefore deductible.

The determination we must make, therefore, is whether the costs incurred in this case are more properly viewed as costs associated with defending a business or as costs associated with facilitating a capital transaction.[6] *See Woodward v. Commissioner,* 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970). It is clear that SCI was engaged in the process of defending its business from attack. "The management, board of directors, and investment bankers of SCI considered the Tate & Lyle tender offer to be hostile, because Tate & Lyle made it directly to SCI shareholders without the knowledge, endorsement, or encouragement of the management or the board of directors of SCI." *A.E. Staley Mfg. Co. v. Commissioner,* 105 T.C. 166, 173, 1995 WL 535269 (1995). The board's initial reaction "was that the offer was inadequate and that a Tate & Lyle takeover would not be in the best interests of SCI, because Tate & Lyle 'brought nothing to the table' in terms of capital, marketing, or research and development and, also, because Tate & Lyle would abandon the SCI long-term strategic plan of entering the food service business." *Id.* at 174. At that time, no one in SCI wanted to negotiate with Tate & Lyle, and all thought the tender offer should be defeated. Twice thereafter SCI's board voted unanimously to reject the offer

---

**5.** *See id.* ("[T]he mere presence of an incidental future benefit—'some future aspect'—may not warrant capitalization . . . .") (emphasis in original); *Commissioner v. Lincoln Sav. & Loan Ass'n,* 403 U.S. 345, 354, 91 S.Ct. 1893, 1899, 29 L.Ed.2d 519 (1971) ("[T]he presence of an ensuing benefit that may have some future aspect is not controlling; many expenses concededly deductible have prospective effect beyond the taxable year."); *E.H. Sheldon & Co. v. Commissioner,* 214 F.2d 655, 659 (6th Cir.1954) (noting that advertising expense is deductible even though advertising results in benefits over future years); Mark J. Silverman, "Tax Treatment of Reorganization Costs," 390 PLI/Tax 625, 636 (Oct.-Nov. 1996) (noting that the IRS has ruled that *INDOPCO* did not alter deductibility of advertising costs, incidental repair costs or severance pay-

ments, even though they may have a future effect on business activities).

**6.** Some costs may rightly be said to be associated with both, such as those involved in a situation in which the target corporation successfully defends against a takeover by merging with a white knight. In such a situation, those expenses related to the evaluation and facilitation of the friendly acquisition might well require capitalization under *INDOPCO, General Bancshares* and *Ellis Banking.* Boris I. Bittker & James S. Eustice, Federal Income Taxation of Corporations and Shareholders para. 5.04[4] (6th ed. 1994 & Supp.1996). We need not be detained by that hypothetical situation in this case, though; our taxpayer did not find a suitable white knight with which to merge.

and advised SCI's stockholders to do the same. During the process, Tate & Lyle sued SCI to void SCI's takeover devices and the applicable antitakeover statutes. The diversification policy of SCI's board was also under attack: A letter from Shaw (Tate & Lyle's CEO) to Nordlund (SCI's CEO) published in the tender offer criticized Nordlund for straying from SCI's core business. Indeed, after the merger, Tate & Lyle sold CFS Continental, Inc., thereby abandoning SCI's strategy to diversify into the food service industry. In addition, once it gained control of SCI, Tate & Lyle replaced SCI's management, fired 104 executives, and closed the company's headquarters; and SCI's entire board of directors resigned. The totality of the Tax Court's factual findings makes clear that SCI was defending against an unwanted acquisition in an effort to maintain and protect an established business. SCI hired the investment bankers and incurred their fees while resisting an acquisition.

Of course, it is the nature of the services performed by the investment bankers that determines the proper tax treatment of the costs of those services. *Honodel v. Commissioner,* 76 T.C. 351, 365, 1981 WL 11238 (1981) ("[W]e look to the nature of the services performed by the investment advisor rather than their designation or treatment by the taxpayer.") (internal quotations and citation omitted), *aff'd,* 722 F.2d 1462 (9th Cir. 1984); *cf. Woodward v. Commissioner,* 397 U.S. 572, 577–79, 90 S.Ct. 1302, 1306–07, 25 L.Ed.2d 577 (1970); *United States v. Gilmore,* 372 U.S. 39, 49, 83 S.Ct. 623, 629, 9 L.Ed.2d 570 (1963); *Deputy v. du Pont,* 308 U.S. 488, 496, 60 S.Ct. 363, 367–68, 84 L.Ed. 416 (1940); *Anchor Coupling Co. v. United States,* 427 F.2d 429, 432–33 (7th Cir.1970), *cert. denied,* 401 U.S. 908, 91 S.Ct. 866, 27 L.Ed.2d 806 (1971). SCI's major defensive strategy was to engage in a capital transaction that would prevent the Tate & Lyle acquisition. Some of SCI's initial ideas in this regard included a financial restructuring, a recapitalization, a sale of equity or securities, a sale of all or part of the company, a joint venture, and a leveraged buy-out. One function performed by the investment bank-

ers was to prepare recapitalization and leveraged buy-out studies to aid in the evaluation of these ideas. Another was to prepare documents to present to prospective white knights. The investment bankers also provided advice to SCI with respect to a number of alternatives, which included a recapitalization, a leveraged buy-out, a placement of blocks of stock, a spin-off, a public offering, and an offer to buy Tate & Lyle ("pac-man" defense). In assessing the feasibility of these alternatives, the investment bankers held numerous conferences with potential investors about acquiring SCI and about providing loans for recapitalization. Merrill Lynch in particular hired counsel to investigate whether SCI could purchase Tate & Lyle stock and block the takeover.

None of these tasks served to facilitate the Tate & Lyle acquisition. Instead, objectively assessed, the tasks performed by the investment bankers frustrated the occurrence of the merger that eventually took place. Moreover, in substance, most of the services the investment bankers performed consisted of failed attempts to engage in alternative capital transactions. Section 165(a) [7] permits a deduction for costs associated with abandoned capital transactions. *See Sibley, Lindsay & Curr Co. v. Commissioner,* 15 T.C. 106, 1950 WL 33 (1950), *acq.,* 1951–1 C.B. 3; *United States v. Federated Dep't Stores (In re Federated Dep't Stores),* 171 B.R. 603, 611 (S.D.Ohio 1994); Rev. Rul. 73–580, 1973–2 C.B. 86; Rev. Rul. 67–125, 1967–1 C.B. 31. "[E]xpenses incurred in the development of plans involving the organization or reorganization of corporations become deductible when the plans are abandoned...." *El Paso Co. v. United States,* 694 F.2d 703, 712 (Fed.Cir.1982). SCI contemplated numerous capital transactions that were later abandoned on May 13 when SCI agreed to the merger with Tate & Lyle. The fees paid to the investment bankers in connection with those abandoned transactions are therefore deductible as abandonment loss under § 165(a). *See Sibley,* 15 T.C. at 110; *Federated Dep't Stores,* 171 B.R. at 610–13

---

**7.** Section 165(a) provides: "There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise." I.R.C. § 165(a).

(holding that break-up fees paid to white knight in failed effort to merge with white knight in response to hostile tender offer were deductible under § 165(a) as costs related to abandoned transaction).

■ In urging that the investment bankers' fees are related to the Tate & Lyle acquisition, the Commissioner points to the parties' fee arrangement, which provided that the investment bankers would be paid if a merger took place. That arrangement also provided, however, that payment would be forthcoming if a recapitalization occurred or if no merger occurred. The purpose of such an arrangement is clear: The investment bankers were to be paid whether or not they were successful in their endeavor to defeat Tate & Lyle's tender offer. We agree that the form of the fee arrangement is a relevant consideration, but the substance of the transaction, not its form, is controlling. *See Clark Oil & Refining Corp. v. United States,* 473 F.2d 1217, 1220–21 (7th Cir.1973). We must look to all the facts of the case, including to the fee arrangement, to determine the context of the expenditures and the services for which the investment bankers were paid.

■ The investment bankers admittedly did perform some facilitative tasks. First, when they were initially hired on April 12, the investment bankers prepared an evaluation of the true value of SCI's stock. That evaluation, objectively speaking, eventually served the function of facilitating the merger because it was used to determine that Tate & Lyle's final offer was fair and should be accepted. As we noted earlier, and as the Supreme Court reaffirmed in *INDOPCO,*. the costs incurred in evaluating and investigating a completed capital transaction—such as a merger or other change in corporate structure—must be capitalized. *See INDOPCO, Inc. v. Commissioner,* 503 U.S. 79, 89–90 & n. 7, 112 S.Ct. 1039, 1046 n. 7, 117 L.Ed.2d 226 (1992); *Ellis Banking Corp. v. Commissioner,* 688 F.2d 1376, 1379–82 (11th Cir. 1982), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3537, 77 L.Ed.2d 1388 (1983). Second, we have been told, at oral argument and in the briefs, that the investment bankers spent a few hours performing some facilitative function near the end of the process. *See* Appellant's Br. at 39; Appellee's Br. at 48; Reply Br. at 23–24. The costs associated with those activities must also be capitalized under *INDOPCO* and *Ellis Banking.*

We conclude that the bulk of costs at issue in this case related to SCI's defense of its business and its corporate policy and is therefore deductible under § 162(a).[8] Those costs properly allocable to the efforts to engage in an alternate transaction are also deductible under § 165. The Commissioner's contrary position rests upon a strained view of the "origin" of the fees in this case. Her logic runs as follows: The investment bankers would not have been hired and paid if there had not been a takeover; their fees therefore have their "origin" in the Tate & Lyle acquisition; the Tate & Lyle acquisition was a capital transaction with long-lasting effects; so the investment bankers' fees, having their origin in a capital transaction, must

8. Because the investment banker fees were incurred to defend a business from attack, they satisfy *Lincoln Savings'* second requirement for deductibility, that the item "be for 'carrying on any trade or business.' " 403 U.S. 345, 352, 91 S.Ct. 1893, 1898, 29 L.Ed.2d 519 (1971) (quoting I.R.C. § 162(a)). The same cases that support the fees' deductibility hold that such fees are business related. The Commissioner insists otherwise, arguing for the first time on appeal that the fees in this case were made for the benefit of another (the shareholders). Yet all corporate expenditures benefit the shareholders in some way, if the board of directors and management are spending money wisely. The cases cited by the Commissioner, *see, e.g., Interstate Transit Lines v. Commissioner,* 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607 (1943), involve costs that were incurred by engaging in activities apart from the taxpayer's business. In contrast, SCI, we have determined, was protecting its core business from attack. Costs incurred in such an effort, the cases hold, are for "carrying on any trade or business." Moreover, we agree with Judge Cohen that the causal connection between SCI's expenditures and Tate & Lyle's increasing its offering price is too attenuated to give it legal significance. *See A.E. Staley Mfg. Co. v. Commissioner,* 105 T.C. 166, 217, 1995 WL 535269 (1995) (Cohen, J., dissenting). As noted above, all smart corporate expenditures benefit shareholders, at least in an attenuated fashion. The Commissioner's position, taken to its logical extreme, would write § 162 out of the books. Like Judge Cohen, we are unpersuaded by the. Commissioner's position in this regard, especially given the lack of any discussion of shareholder benefit in *INDOPCO.*

be capitalized.[9] Yet, under any view, most of the fees paid to the investment bankers were not "of value in more than one taxable year." *United States v. Mississippi Chem. Corp.,* 405 U.S. 298, 310, 92 S.Ct. 908, 915, 31 L.Ed.2d 217 (1972); *see* Peter L. Faber, *"INDOPCO:* The Still Unsolved Riddle," 47 Tax Law. 607, 640 (Spring 1994). The main efforts of the investment bankers were directed towards defeating a hostile tender offer by exploring alternate capital transactions. These efforts failed; the investment bankers' services in this regard bore no fruit. As a result, unlike the taxpayer in *INDOPCO,* SCI did not obtain a long-term benefit as a result of making these expenditures. The function of the Tax Code is "to achieve an accurate measure of net income for the year by matching outlays with the revenues attributable to them and recognizing both during the same taxable year." *Ellis Banking Corp. v. Commissioner,* 688 F.2d 1376, 1379 (11th Cir.1982), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3537, 77 L.Ed.2d 1388 (1983); *see INDOPCO,* 503 U.S. at 83–84, 112 S.Ct. at 1042–43. The majority of investment banker fees in this case will reap no revenues to match; those fees are an immediate loss in the year incurred. To require capitalization

under the facts of this case would result in an overstated net income for the year. In holding that defense costs are deductible, we reach the same conclusion as the only other court to have considered the issue. *See United States v. Federated Dep't Stores (In re Federated Dep't Stores),* 171 B.R. 603, 610 (S.D.Ohio 1994), *aff'g, In re Federated Dep't Stores,* 135 B.R. 950 (Bankr.S.D.Ohio 1992).[10] "If a different conclusion is to be reached, that end is for the Congress and not for the federal courts." *General Bancshares Corp. v. Commissioner,* 326 F.2d 712, 717 (8th Cir.), *cert. denied,* 379 U.S. 832, 85 S.Ct. 62, 13 L.Ed.2d 40 (1964).

To summarize, the fees associated with the preparation of the evaluation of SCI's stock and with the few hours of facilitative work performed by the investment bankers at the time of the merger must be capitalized. However, the other fees may be deducted. As Justice Cardozo declared, our Tax Code requires a practical, realistic assessment. Such an assessment demands that SCI's costs, associated with genuinely different functions, must be treated differently. We therefore remand for the Tax Court to allocate a sum of the fees for capitalization to the facilitative activities of the investment bank-

9. As the Commissioner's reasoning shows, in borderline cases, "it is difficult to determine whether the origin of particular litigation [or of costs] lies in the process of acquisition." *Woodward v. Commissioner,* 397 U.S. 572, 578, 90 S.Ct. 1302, 1306, 25 L.Ed.2d 577 (1970); *see also* Timothy A. Rodgers, Note, "The Transaction Approach to the Origin of the Claim Doctrine: A Proposed Cure for Chronic Inconsistency," 55 Brook.L.Rev. 905 (1989). Justice Jackson illustrated the way that such reasoning could lead to varying results:

A majority of my brethren seem to think they can escape this conclusion by going further back in the chain of causation. They say the cause of this legal expense was the gift. Of course one can reason, as my brethren do, that if there had been no gifts there would have been no tax, if there had been no tax there would have been no deficiency, if there were no deficiency there would have been no contest, if there were no contest there would have been no expense. And so the gifts caused the expense. The fallacy of such logic is that it would be just as possible to employ it to prove that the lawyer's fees were caused by having children. If there had been no children there would have been no gift, and if no gift no tax, and if no tax no deficiency, and if no deficiency

no contest, and if no contest no expense. Hence, the lawyer's fee was not due to the contest at all but was a part of the cost of having babies. If this reasoning were presented by a taxpayer to avoid a tax, what would we say of it? So treacherous is this kind of reasoning that in most fields the law rests its conclusion only on proximate cause and declines to follow the winding trail of remote and multiple causations.

*Lykes v. United States,* 343 U.S. 118, 128, 72 S.Ct. 585, 591, 96 L.Ed. 791 (1952) (Jackson, J., dissenting).

10. *See also* Bittker & Eustice, *supra* note 6, para. 5.04[4]:

[E]xpenses paid by the corporation in resisting a hostile tender offer ... should be deductible on the same basis as the cost of defending a proxy fight—that is, the expenses are incurred primarily to protect the business rather than to acquire property and are primarily related to questions of corporate policy.... [A] hostile acquirer in fact almost always wants to change the board, and in many cases the management, and may want to break up the assets and businesses of the corporation, all of which the current board may properly view as inimical to the corporation and the current shareholders.

ers and printer performed in preparing the evaluation of SCI's stock and in facilitating the merger at the time of its consummation. *See generally Ellis Banking*, 688 F.2d at 1382–83 (holding that, on remand, the Tax Court should make an allocation to the best of its ability). Given the fee arrangement in this case, we understand, as did the court in *Ellis Banking*, that allocation may not be a simple task. Businesses in the future would do well to structure their agreements in a fashion more amenable to the requirements of the Tax Code as we have delineated today. Of course, the Commissioner could facilitate greatly the collection of the revenues by issuing precise regulations addressing this recurring problem in American corporate life.

### Conclusion

The judgment of the Tax Court is reversed. The case is remanded for proceedings consistent with this opinion.

REVERSED AND REMANDED.