# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 02-1239

ILLINOIS TOOL WORKS INC. and subsidiaries,

*Petitioner-Appellant,*

v.

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

Appeal from the United States Tax Court.
No. 16022-99—**Mary Ann Cohen**, *Judge.*

ARGUED SEPTEMBER 12, 2003—DECIDED JANUARY 21, 2004

Before BAUER, KANNE, and EVANS, *Circuit Judges.*

KANNE, *Circuit Judge.* Illinois Tool Works Inc. and its subsidiaries ("ITW") appeal from the tax court's determination that $6,956,590 of a more than $17 million court judgment paid by ITW should be capitalized as a cost of acquiring certain assets of the DeVilbiss Co. rather than deducted as an ordinary business expense. The judgment at issue was the result of a jury verdict in a patent infringement suit filed against DeVilbiss's former owner, Champion Spark Plug, Inc. ITW assumed the pending lawsuit, and its defense, upon its acquisition of DeVilbiss in 1990. ITW

acknowledges that at least a portion of the judgment should be capitalized as a cost of acquisition, but disputes the amount. We agree with the determination of the tax court and affirm.

## I.  History

The facts are not in dispute. DeVilbiss was a division of Champion in the 1970s. In 1975, Jerome H. Lemelson, an inventor and engineer, wrote DeVilbiss and offered to license it certain of his patents, including the " '431 patent." DeVilbiss, fatefully, did not take Lemelson up on the offer.

Instead, in 1978, DeVilbiss acquired a license from a Norwegian company named Trallfa to sell its computer-controlled paint-spray robots. Attorneys for Lemelson contacted DeVilbiss in 1979, notifying it that certain of its products in the robot and manipulator field might be infringing on Lemelson's patents, including the '431 patent. DeVilbiss's director of robotic operations replied, summarily denying any infringement. Thereafter, in 1980, DeVilbiss and Trallfa entered a new license agreement whereby DeVilbiss gained the right to manufacture, as well as to sell, Trallfa robots.

The first of two relevant patent infringement suits brought by Lemelson followed in 1981. Lemelson launched that suit in the U.S. Court of Claims ("Court of Claims lawsuit") against the United States, alleging that its purchase and use of certain robots, including the Trallfa robot, infringed his patents. Champion, owner of DeVilbiss, entered as a third-party defendant. The government ultimately settled that suit for $5000 and sought indemnification from Champion. Notably, the presiding judge in that action told the parties prior to settlement that based on his view of the merits, Lemelson was unlikely to succeed.

Lemelson filed the second patent infringement suit in 1985 against Champion directly ("Lemelson lawsuit"), alleging as he had before that the Trallfa robot infringed on several of his patents, including the '431 patent. He sought damages relating to the sale of Trallfa robots prior to 1986. That case was stayed shortly after filing, pending the resolution of the 1981 Court of Claims lawsuit.

DeVilbiss retained counsel to represent it in the Lemelson lawsuit. That attorney, Mark C. Schaffer, specialized in intellectual property law. In his estimation the case was meritless, and he communicated the same to DeVilbiss. Larry Becker, division counsel and secretary of DeVilbiss at the time the Lemelson lawsuit was filed, also evaluated the case and came to the same conclusion. But, he set a range of exposure between $25,000 and $500,000 for internal purposes. In 1989, before ITW purchased DeVilbiss, Lemelson offered to settle for $500,000. DeVilbiss rejected the offer, countering with $25,000. Although not clear from the record, settlement discussions apparently stalled, and, in any event, no settlement was reached at that time.

ITW acquired DeVilbiss in 1990.[1] In the purchase agreement, ITW agreed to assume certain liabilities of the seller, which included the pending Lemelson lawsuit. ITW became aware of the Lemelson lawsuit prior to closing, during the due diligence phase of the sale, which ITW conducted over a ten-to-fourteen-day period. As part of the due diligence review, DeVilbiss disclosed all of its pending litigation, including the Lemelson lawsuit. Although the damages claimed by Lemelson were described as "open" on the schedule provided to ITW, Becker reiterated his opinion

---

[1] Prior to ITW's purchase of DeVilbiss, Champion had sold it to Eagle Industries, who then sold it to ITW. The Lemelson lawsuit was pending throughout these transactions.

that the lawsuit was meritless. ITW representatives, including its director of audits, vice president of patents and technology, and group technology counsel (the latter two patent attorneys), reviewed the Lemelson case and agreed with Becker. They ascribed a 98-to-99 percent chance of prevailing at trial, with a worst case scenario exposure of $1 million to $3 million. They also negotiated a $350,000 cash reserve to cover the attorneys' fees expected to be incurred in defending the suit. Except for the accountants, Arthur Andersen, and Schaffer, the outside counsel retained by DeVilbiss, the record reveals no other outside analysts brought in to examine the risk represented by the Lemelson lawsuit.

As a result of ITW's due diligence findings, the agreed purchase price for DeVilbiss was lowered from $126.5 million to $125.5 million. The Lemelson lawsuit was not a factor in this decision.

After the deal closed, the Lemelson lawsuit was reopened, and ITW assumed the defense as the real party in interest, although Champion remained named in the caption. ITW continued to employ Schaffer, the outside counsel initially hired by DeVilbiss, to represent it. At various points prior to and during trial, Lemelson offered to settle the case. The last offer, for more than $1 million, came after most of the evidence had been heard and at the urging of the trial court. ITW rejected the settlement offer and did not counter.

In January 1991, a jury returned a verdict in favor of Lemelson. It awarded $4,647,905 for patent infringement and $6,295,167 in prejudgment interest. The district court doubled the patent infringement award because the jury found that not only had the '431 patent been infringed, it had been willfully infringed. The willfulness finding was based in part on Champion's failure to secure an authoritative opinion on whether the Trallfa robot infringed the '431

patent until two months before trial. ITW was, to say the least, stunned by the $15,590,977 verdict.

ITW appealed and lost. It finally paid the judgment in 1992, which, with accumulated interest, totaled $17,067,339. On its 1992 tax return, it capitalized $1 million of the judgment as a cost of acquiring DeVilbiss and deducted the remaining $16 million as an ordinary business expense. The reason for the bifurcation, as explained in ITW's Form 8275-R Disclosure Statement that accompanied its 1992 return, was that since it could have settled the Lemelson lawsuit for $1 million, the remaining $16 million liability resulted from the post-acquisition business decision to reject the settlement offer and chance it in court. In essence, ITW contended that its gamble on a jury trial caused it to incur significant additional expenditures over $1 million (the perceived worth of the lawsuit based on the last settlement offer)—not the acquisition of DeVilbiss and its contingent liability in the form of the Lemelson suit. As such, ITW reasoned that the amount of the judgment attributable to its bad decisions should be deducted as an ordinary business expense rather than capitalized as a cost of acquisition. The Commissioner of Internal Revenue and the tax court rejected this novel *mea culpa* argument and so do we.[2]

## II. Analysis

This case revolves around the difference between capital and ordinary business expenses as expressed in the

---

[2] Only $6,956,590 of the $17 million judgment is at issue on appeal because (a) ITW capitalized $1 million in its tax return; (b) the Commissioner conceded an allowance of $2,154,160 for post-acquisition interest and expenses; and (c) the Commissioner conceded a reduction of $6,956,589 due to the sale of certain DeVilbiss assets acquired in the 1990 purchase.

Internal Revenue Code. The Code allows the immediate deduction of "all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." 16 U.S.C. § 162(a); *INDOPCO v. Commissioner*, 503 U.S. 79, 83 (1992). The opposite is true of capital expenses, which the Code defines as "an amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." 26 U.S.C. § 263(a)(1); *INDOPCO*, 503 U.S. at 83. Ordinary business expenses, then, are generally incurred to meet a taxpayer's immediate or *current* business needs within the present taxable year. *See id.* at 85. Capital expenses are generally incurred for the taxpayer's *future* benefit. *Id.* at 90 (noting that generally an expense is characterized as capital when "the purpose for which the expenditure is made has to do with the corporation's operations and betterment . . . for the duration of its existence or for the indefinite future or for a time somewhat longer than the current taxable year." (quotations omitted)).

The practical result of labeling an expense "ordinary" or "capital" is that generally a taxpayer can take an immediate, full deduction for ordinary business expenses and realize an immediate corresponding reduction in taxable income, while capital expenses generally result in smaller yearly deductions over time through amortization and depreciation. As summarized by the Supreme Court:

> The primary effect of characterizing a payment as either a business expense or a capital expenditure concerns the timing of the taxpayer's cost recovery: While business expenses are currently deductible, a capital expenditure usually is amortized and depreciated over the life of the relevant asset, or, where no specific asset or useful life can be ascertained, is deducted upon dissolution of the enterprise. See U.S.C. §§ 167(a) and 336(a); Treas. Reg. § 1.167(a), 26 C.F.R. § 1.167(a). Through provisions such as these, the Code endeavors

> to match expenses with the revenues of the taxable period to which they are properly attributable, thereby resulting in a more accurate calculation of net income for tax purposes.

*INDOPCO*, 503 U.S. at 83-84.

"Whether a taxpayer is required to capitalize particular expenses is a question of law, and our review is therefore de novo." *U.S. Freightways Corp. v. Commissioner*, 270 F.3d 1137, 1139 (7th Cir. 2001); *see also Wells Fargo & Co. v. Commissioner*, 224 F.3d 874, 880 (8th Cir. 2000). We note that ITW, who argues that the majority of the Lemelson judgment should be labeled ordinary business expenses, hence fully and immediately deductible, bears the burden of proving entitlement to the claimed deduction. *U.S. Freightways*, 270 F.3d at 1145. This is because income tax deductions are a matter of legislative grace and the exception to the norm of capitalization. *Id.; INDOPCO*, 503 U.S. at 84.

ITW's burden is particularly heavy because, as recognized by the tax court, our prior precedent states that there is a "well-settled general rule that when an obligation is assumed in connection with the purchase of capital assets, payments satisfying the obligation are non-deductible capital expenditures." *David R. Webb Co., Inc. v. Commissioner*, 708 F.2d 1254, 1256 (7th Cir. 1983). ITW acknowledged the force of this rule when it capitalized a portion of the Lemelson judgment as attributable to the obligation (in the form of the pending lawsuit) assumed upon acquiring DeVilbiss.

Relying on *A.E. Staley Mfg. Co. v. Commissioner*, 119 F.3d 482 (7th Cir. 1997), though, ITW argues that the tax court erred by applying the rule articulated in *Webb* inflexibly and eschewing the pragmatic, "real life" inquiry advanced in *Staley*. Had it approached ITW's challenge properly, ITW

posits, the tax court would have found that except for ITW's mishandling of the lawsuit after acquisition, the value of the Lemelson lawsuit would have been "capped" at $1 million. Thus, anything above $1 million should be attributable to decisions made in the course of defending the litigation and deducted as an ordinary business expense. *See, e.g., Commissioner v. Tellier*, 383 U.S. 687 (1966) (legal expenses incurred in defending against securities fraud charges deductible under § 162(a)); *Commissioner v. Heininger*, 320 U.S. 467 (1943) (legal expenses incurred in disputing adverse postal designation deductible as ordinary and necessary business expenses). We find fault with ITW's argument on several levels.

### A.  ITW misreads the tax court's approach to *Webb.*

First, the tax court did not apply *Webb* inflexibly. ITW reads the tax court's opinion to state that "any payment in satisfaction of a contingent liability acquired in a capital transaction is *always* a capital expenditure." (Appellants' Opening Br. at 19). We do not read the tax court's opinion so restrictively. Rather, we note the opinion accurately cites *Webb* for the proposition that "*[g]enerally*, the payment of a liability of a preceding owner of property by the person acquiring such property, whether or not such liability was fixed or contingent at the time such property was acquired, is not an ordinary and necessary business expense." *Illinois Tool Works, Inc. v. Commissioner*, 117 T.C. 39, 44-45 (2001) (emphasis added). The tax court's language analyzing ITW's case in light of the above general principle does not foreclose in every circumstance an outcome different than the one reached; rather, it simply notes that ITW's arguments for treating all but $1 million of the judgment as an ordi-

nary business expense are not persuasive in "the present case." *Id.* at 47.[3]

## B. *Webb* controls

Next, we agree with the tax court that the facts of this straightforward case do not dictate a departure from *Webb*. In *Webb*, the taxpayer acquired a wood veneer company that many years ago agreed to pay an employee's widow, Mrs. Grunwald, a lifetime pension of $12,700 annually. 708 F.2d at 1255. The taxpayer knowingly assumed the liability to Mrs. Grunwald as part of the purchase agreement. *Id.* In tax years thereafter it attempted to deduct, as an ordinary and necessary business expense, the $12,700 paid to Mrs. Grunwald. The Commissioner determined that the $12,700 was not an ordinary business expense, but a capital one, which the tax court upheld. *Id.* at 1255-56.

We affirmed, observing that because the taxpayer agreed to assume the pension payments as part of its purchase agreement for the wood veneer business, the payments were more properly attributed to that capital investment, not its current business operations. *Id.* at 1256. In essence, the agreement to pay the debt to the widow served as part of the purchase price for the business. *Id.* ("Assumption of the obligation to make pension payments to Mrs. Grunwald was in theory and in fact, part of the cost of acquiring the assets of the wood veneer business from the taxpayer's predecessor.") Because the purchase of the wood veneer business was meant to enhance the taxpayer's operations into the future, the expenses to acquire it—which included the discharge of the annual debt to Mrs. Grunwald—had to be

---

[3] ITW argued for deductibility on several different grounds before the tax court, abandoning all but its reliance on *Staley* on appeal.

capitalized. *Id.* (stating that generally "when an obligation is assumed in connection with the purchase of capital assets, payments satisfying the obligation are non-deductible capital expenditures").

Similarly, ITW knowingly assumed the Lemelson lawsuit as part of the purchase agreement for the DeVilbiss assets. Because ITW agreed to pay that contingent liability in exchange for DeVilbiss, that contingent liability formed part of the purchase price. Because the DeVilbiss acquisition was meant to benefit ITW into the future, the expenses to acquire it—including the Lemelson lawsuit, once assigned a value through the judgment—must be capitalized.

ITW attempts to distinguish *Webb* based on the parties' expectation of the ultimate value of the Lemelson lawsuit and on ITW's alleged ability, post-acquisition, to negatively impact the liability amount. In *Webb*, the acquiring company knew that it owed an annual liability of $12,700 and that it would end when Mrs. Grunwald passed. Therefore, ITW argues, the parties in *Webb* had a complete understanding of the scope of the contingent liability at stake in the deal, unlike in the case before us where the parties to the transaction failed to grasp the risk represented by the Lemelson lawsuit. ITW also urges that since the taxpayer in *Webb* could do nothing to affect the amount of the liability, unlike here where the failure to accept a settlement offer increased the debt exponentially, *Webb* should be ignored.

ITW's attempts to distance itself from *Webb* are unavailing. ITW agreed to assume the Lemelson defense and pay any judgment, whatever it may be. Although we have no doubt the parties earnestly believed the case was meritless, ITW cannot dispute that it acknowledged some risk, albeit minimal, and did not take steps to mitigate that risk. It could have lowered the purchase price or inserted an

indemnification clause in the purchase agreement to recoup any losses not anticipated by the parties. That a contingent liability, once fixed, exceeded the parties' expectations does not render it any less a part of the purchase price. *See Pacific Transport Co. v. Commissioner*, 483 F.2d 209, 213 (9th Cir. 1973) (noting that a taxpayer's failure to realize the substance or amount of a contingent liability assumed when acquiring property does not change its tax treatment—the payment must be capitalized); *but see Nahey v. Commissioner*, 196 F.3d 866, 870 (7th Cir. 1999) (criticizing *Pacific Transport* in *dicta*). In this case, protection from an aberrant jury verdict needed to be sought during contract formation, not after the fact in the form of an immediate tax deduction.

Moreover, ITW's entire premise that its actions after assuming the liability should be examined for the effect it had on increasing the amount of the ultimate indebtedness strays from the inescapable fact that, like the taxpayer in *Webb*, it accepted the indebtedness in order to acquire what it perceived to be a future benefit—DeVilbiss. Part of ITW's process of valuing the DeVilbiss assets and arriving at the purchase price included evaluating the Lemelson lawsuit. In that due diligence phase, ITW assessed a value to the suit based on how it foresaw the litigation unfolding once it took control of the defense. Its ability to affect the outcome of the Lemelson lawsuit was therefore already factored in. That things did not go according to plan, and that, in retrospect, it should have paid far less for DeVilbiss to account for size of the judgment assigned, does not change the tax character of the judgment in this case.

## C. *Staley*'s Application

Finally, *Staley* does not warrant a different outcome, as ITW insists. In *Staley*, this Court reversed the tax court's

determination that fees paid to investment bankers to unsuccessfully ward off a hostile takeover had to be capitalized by the defending company, rather than deducted as an ordinary business expense. 119 F.3d at 483. The tax court, in determining that these incidental fees were part of the capital transaction ultimately resulting in the taxpayer's hostile acquisition by a corporate raider, purported to follow the Supreme Court's decision in *INDOPCO v. Commissioner*, 503 U.S. 79 (1992). *Id.* at 485. The *INDOPCO* case also involved investment banking fees, but in the context of a friendly, as opposed to hostile, takeover of National Starch by Unilever. There the Court found that the money paid to the investment bankers by National Starch was for the purpose of facilitating a favorable merger with Unilever, thus changing the corporate structure for the benefit of future operations—a capital expense. *INDOPCO*, 503 U.S. at 88-90.

In disagreeing with the tax court's application of *INDOPCO*, we found it significant that the majority of the fees paid in *Staley* were for the purpose of defending against what the company perceived to be an unfavorable, hostile takeover. *Staley*, 119 F.3d at 491. Because defending a company against attack is considered a necessary and ordinary business expense, designed to benefit current operations, *id.* at 487, we remanded the case to the tax court. We asked it to allocate the fees paid between those activities that were considered in defense of the company, an ordinary expense immediately deductible, and those that facilitated the ultimate merger, a capital expense meant to benefit the company into the future. *Id.* at 492-493.

Our analysis in *Staley* was based on the recognition that distinguishing between ordinary expenses and those that must be capitalized can sometimes be difficult. *Id.* at 487 ("As the Supreme Court has noted, 'the cases sometimes appear difficult to harmonize,' and 'each case turns on its

special facts.'" (quoting *INDOPCO*, 503 U.S. at 86)). When faced with this challenge, we observed that "distinguishing between ordinary and capital costs often requires a rather pragmatic approach." *Id. Staley* was such a case, with its factual similarities to the *INDOPCO* decision and turning on incidental, rather than direct, costs of an acquisition. Therefore, we specifically applied a "pragmatic assessment" to the underlying facts in order to decipher whether the fees incident to the hostile takeover were for current defense of the company or for an ultimate corporate change with benefits lasting into the future. *See id.* at 487-92.

Our task here is easier than in *Staley*. The taxpayer points us to no decision in conflict with *Webb*, where payments made to satisfy an obligation directly assumed as part of a bargained-for acquisition have not been capitalized as part of the purchase price of the asset. Regardless, applying the pragmatic approach called for in *Staley* results in the same outcome, and is implicit, if not explicit, in the tax court's opinion.[4] The record consists of three sets of stipulated facts with dozens of attendant exhibits and a day-long trial transcript in which ITW presents seven witnesses. The tax court's opinion coalesced that testimony

---

[4] We find it curious that ITW would choose to attack Judge Cohen for failing to engage in the appropriate open-minded, fact-based inquiry advocated in *Staley*. Judge Cohen, who served as trial judge in the *Staley* case, as well as here, dissented from the tax court opinion from which the *Staley* appeal was taken. *A.E. Staley Mfg. Co. v. Commissioner*, 105 T.C. 166, 210 (1995) (Cohen, J., dissenting). It was her dissent that this Court cited favorably in its ruling reversing the tax court. *See Staley*, 119 F.3d at 491 n.8. And, in her closing instructions to the parties about their post-trial briefs in the present matter, she discusses *Staley* and its possible implications, describing her involvement in that case. (Tr. at 214-15.)

and documentary evidence into findings of fact, which ITW, by its own admission, embraces. From those facts and the arguments advanced by the parties, the tax court deduced that this was not a case in which the general rule articulated in *Webb* would not apply.

Looking at the facts, we agree. The ultimate goal of the pragmatic assessment advanced by *Staley* is to decode whether an expenditure is ordinary or capital in nature. Although ITW argues that paying $16 million more than the Lemelson lawsuit was allegedly worth could have no positive impact on the future of the company, it loses sight of the fact that what it got in exchange for its obligation to pay the judgment was the DeVilbiss assets. In this way, the Lemelson judgment was "'incurred for the purpose of changing the corporate structure for the benefit of future operations'" and must be capitalized. *Staley*, 119 F.3d at 489 (quoting *INDOPCO*, 503 U.S. at 89). As stated by the court in *United States v. Smith*, observing that the substance, not the form of the transaction governs when determining tax treatment of a settlement paid to a former employee:

> If the corporation at its inception assumed a contingent obligation to pay [the employee], it is that assumption of liability which obligated the corporation and not any subsequent legitimate business purpose. In other words, the corporation did not have to pay because of the unfavorable judgment or because its directors deemed payment advisable but rather the corporation paid because it assumed the obligation when it became incorporated.

418 F.2d 589, 596 (5th Cir. 1969); *see also Staley*, 119 F.3d at 491 (noting that "the substance of the transaction, not its form, is controlling" (citing *Clark Oil & Refining Corp. v. United States*, 473 F.2d 1217, 1220-21 (7th Cir. 1973)). So too here it was not ITW's failure to accept the settlement

offer that obligated it to pay the jury award, but its assumption of the lawsuit in order to acquire DeVilbiss.

If we examine the events post-acquisition, as ITW urges, the result is still the same. ITW focuses our attention primarily on its missed opportunity to settle the case, contending that had it only taken Lemelson up on his final $1 million offer, instead of staunchly placing its faith in its own valuation of the case, then the liability it acquired along with the DeVilbiss assets would not have increased exponentially. It states, "[t]hus, a 'pragmatic,' 'real-life' assessment of the facts demonstrates that ITW's decision, made in the ordinary course of its business, to reject Lemelson's settlement offers was the proximate cause of the amount ultimately owed to Lemelson." (Appellant's Opening Br. at 32.) Yet, the patent suit claimed damages for infringing robots sold from 1979 to 1985, years before ITW acquired DeVilbiss. ITW's predecessor failed to accept Lemelson's $500,000 settlement offer in 1989. And, as noted by the patent trial court in upholding the jury's finding of willfulness: "Defendant's entire course of conduct from its total disregard of Plaintiff's 1975 letter to its unexplained failure to secure an authoritative opinion until two months before trial, demonstrates an utter lack of concern over Plaintiff's patent rights." (Tr. Ex. 19-J ¶ 23.) A pragmatic assessment of this case leads to the conclusion that the Lemelson lawsuit was mishandled from the outset, arriving in ITW's hands fully formed. ITW's mistakes and missed opportunities had little to do with the ultimate valuation placed on the matter by the jury.

### III.  Conclusion

For the foregoing reasons, the decision of the tax court is AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*